CHESTER MALOLEPSZY, APPELLEE, V. CENTRAL MARKET,
INC., APPELLANT: WALTER E. HARKERT, APPELLEE.

9 N. W. (2d) 474

FILED MAY 7, 1943. No. 31423.

H. A. Palmer and Gaines & Shoemaker, for appellant.

Gross & Crawford and Harry L. Welch, contra.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE,
YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

This is an action for personal injuries resulting from falling into an open elevator shaft in the back of a store. The jury returned a verdict of $5,583.77, for which amount judgment was entered. The defendant appealed. This case was first argued to this court on October 7, 1942, and the opinion then adopted reversed and dismissed the action, and is found in 142 Neb. 570, 7 N. W. (2d) 74.

Plaintiff had been employed for about four years at "Harkert's," a restaurant located at 1619 Farnam street, Omaha. The defendant, Central Market, Inc., conducts a large grocery store, in which there is a meat department, which sells at wholesale and retail, and salesmen solicit from hotels and restaurants for the wholesale meat department. The Central Market is located directly across the alley from the Harkert establishment. All the retail business of the Central Market was closed on Sunday, but it was a custom for favored restaurants and hotels, including Harkert's, to buy meat at wholesale on Sunday whenever an emergency arose. Such special customers would usually send some employee for the meat they needed, who would go to an entrance on the alley and pound on the door until some one inside answered the alarm and gave them the meat, and the charge ticket would be made as of Monday.

At 10:15 on Sunday forenoon, October 27, 1940, the manager of Harkert's sent the plaintiff across the alley to get meat at wholesale. He had often been sent for meat during the week, but this was the first time that he had been sent for meat on Sunday. He rattled the alley door nearest the street, and failed to attract the attention of any one on the inside. F. L. Hogan was engaged in the trucking business, operating his own truck with a helper, and regularly gathered up rubbish and trash, with the help of its employees, from the Central Market. Hogan was standing down the alley at another door into the Central Market, where he was breaking up boxes and bundling them up to be taken away. The plaintiff was dressed in white, with the word "Harkert's" on his uniform, and Hogan called to

him to come down there and go inside where he was and call the elevator man. The plaintiff thereupon went to this second alley door and entered to go to the elevator shaft and call the elevator man. The place was very dimly lighted, and looking straight ahead he saw a slat gate in front of him, which he supposed closed the elevator shaft, and walked towards it to call up to the elevator man, who was on the second floor, but instead the slat gate on the side towards the plaintiff had not worked properly and had stuck and not fallen down as the elevator went up, and the plaintiff walked directly into the unlighted elevator shaft, which he could not see, and fell 15 feet to the bottom of the pit, causing fractures of several vertebrae and other serious injuries. The light was just bright enough so he could see the slats of the gate on the other side, but the floor was dark, and because the gate had failed to come down by gravity on his side, as it should have done, he walked right into the pit.

Plaintiff claims that his injury was caused by reason of the carelessness and negligence of the defendant in the following particulars: (a) Failing to keep its premises in the vicinity of the elevator properly and sufficiently lighted; (b) failing to place the safety gate across the open elevator shaft and pit when the elevator was not at the floor level; (c) moving the elevator from the floor level to the floor above and failing to lower the safety gate to prevent persons from walking into the open elevator pit; (d) failing to warn or caution plaintiff and other persons rightfully on the premises that the elevator pit and shaft were open and unprotected; (e) maintaining a trap and pitfall without properly lighting and guarding it to prevent persons from falling into it.

In its amended answer the defendant specifically denies the allegations in plaintiff's petition that plaintiff entered the place of business of defendant through the rear door which was one of the regular and customary places of entering defendant's place of business; denies that the plaintiff was an invitee on the defendant's premises, and in this

connection alleges "that said entrance, through which the plaintiff entered the defendant's store on this occasion, was not a regular and customary entrance used either by its customers or by the public; that said entrance opened onto a loading platform and into an elevator room used solely and exclusively by this defendant in conducting his business, no part of which was conducted in furthering the sale of its merchandise either at wholesale or at retail; and that said platform, and elevator room, was constructed on the premises separate and apart from that portion of the premises used by this defendant for transacting business with its customers or the public."

Defendant further charges in his amended answer that the plaintiff, at the time of this accident, was a trespasser on the premises, and that the accident and the injuries, if any, were due solely and entirely to the carelessness and negligence of this plaintiff.

For assignments of error the defendant first submits that the court erred in overruling this defendant's motion to dismiss this action or to instruct the jury to return a verdict in favor of this defendant, made at the close of the plaintiff's case and again when all parties had rested.

From an examination of the conflicting evidence in this case, we conclude that the trial court was right in overruling these motions for an instructed verdict.

The next assignments of error relate to the giving of four of the instructions to the jury. An examination of these instructions shows that No. 3 sets out the substance of the answer filed by the defendant, and nothing is pointed out in the brief to call our attention to any important allegation which was omitted by the court. We find no error therein.

The giving of instructions No. 9, on amount of recovery, if any, and No. 10, on mortality tables, is set out as error, but as they are not argued in the brief, and as no error appears, or is pointed out, we hold that these two instructions were properly given.

Now, the particular instruction which is argued at length by the defendant is No. 5, reading as follows:

"You are instructed that the following definitions are to be used by you in determining the status of the plaintiff in his relationship to the defendant Central Market, Inc.:

"The word 'trespasser' is legally defined as a person who enters or remains upon premises in possession of another without a privilege to do so created by the possessor's consent, either express or implied.

"An invitee is a person who enters or remains upon the premises in the possession of another after having been expressly or impliedly invited to do so, such as a person who enters a premises in the possession of another for the purpose of transacting some business with the possessor of the premises.

"You are further instructed that it is the duty of a person in possession of premises, in respect to an invitee or business customer, to keep his premises in a reasonably safe condition for the purpose for which they are intended to be used.

"You are further instructed that a person in possession of premises owes no duty whatever to a trespasser who is on his premises without his knowledge or consent, either express or implied, in respect to keeping his premises in a safe condition."

It is insisted in the defendant's brief that this instruction did not cover a licensee, and that this omission is reversible error.

This court has clearly defined the three terms as follows: "The law places those who come upon the premises of another in three classes: Invitees are those who are expressly or impliedly invited, as a customer to a store; licensees are persons whose presence is not invited, but tolerated; trespassers are persons who are neither suffered nor invited to enter. The duty of the owner toward an invitee is to exercise reasonable care to keep the premises in a safe condition, but licensees take the premises as they find them, the only duty of the occupier being to give notice of traps or concealed dangers. Toward trespassers the occupier need only refrain from wilful or wanton injury as

modified by the 'attractive nuisance' line of cases. See 20 R. C. L. 69, sec. 60." *Haley v. Deer,* 135 Neb. 459, 282 N. W. 389.

The defendant, in support of his contention that the giving of instruction No. 5 was prejudicial, cites: "Where one, at his own request, and solely for his personal pleasure, convenience, or benefit, enters upon the private portion of the business premises of another, with his consent, but without an invitation, he is a bare licensee in such portion of the premises not open to the public, and the occupier of the premises owes no duty to him, save to refrain from inflicting injury upon him." *Collins v. Sprague's Benson Pharmacy,* 124 Neb. 210, 245 N. W. 602.

Also cited is *Wright v. Salvation Army,* 125 Neb. 216, 249 N. W. 549: "The liability of the owner of the premises to an invitee who enters thereon is only coextensive with the invitation, and when the limits of the invitation are exceeded the invitation ceases, and the duty of the owner is only that of abstaining from acts wilfully injurious." In this case there were warning signs, marked "Danger" and "Elevator," while in the case at bar there were no such signs.

Now, we will examine several cases closely in point. In a Minnesota case a farmer was injured by an automobile being repaired and out of control, while he was passing through the rear portion of a village automobile repair and farm implement shop in order to transact business in the front, and it was held that the fact that he reached the place where he was injured by passing through a rubbish-strewn alley and the rear entrance of the building did not constitute him a bare licensee, so as to preclude him from invoking the rights of one upon premises by invitation, and a verdict in his favor was sustained. *Jewison v. Dieudonne,* 127 Minn. 163, 149 N. W. 20.

Another case somewhat similar to the case at bar is that of *Chichas v. Foley Bros. Grocery Co.,* 73 Mont. 575, 236 Pac. 361. Defendant was engaged in wholesale grocery. A freight elevator ran from the basement to the second floor. Plaintiff, a retail grocer, was a steady customer.

He drove his automobile to the rear entrance of defendant's building, stopped at a platform, and by means of a plank walked up on this platform about four feet from the ground, entered a door, and proceeded along a passageway, stored with merchandise, which was not well lighted, and in ignorance of the existence of an unguarded elevator shaft fell into it. It was held (236 Pac. 361) :

"An owner is liable to invitee, for injuries occasioned by unsafe condition of premises, if known to him and not to invitee, and which was negligently suffered to exist without timely notice. In action by invitee, for injuries sustained by falling through open elevator shaft maintained in defendants' building, contributory negligence of invitee *held* for jury."

We cite additional cases bearing upon the points involved: *Brett v. Century Petroleums, Inc.,* 302 Ill. App. 99, 23 N. E. (2d) 359; *Palmer v. Boston Penny Savings Bank,* 301 Mass. 540, 17 N. E. (2d) 899; *Rudolph v. Elder,* 105 Colo. 105, 95 Pac. (2d) 827; *Pauckner v. Wakem,* 231 Ill. 276, 83 N. E. 202; *Armour & Co. v. Rose,* 183 Ark. 413, 36 S. W. (2d) 70; *St. Louis, I. M. & S. Ry. Co. v. Wirbel,* 104 Ark. 236, 149 S. W. 92.

Defendant cites the case of *Wentink v. Traphagen,* 138 Neb. 41, 291 N. W. 884, as controlling in the case at bar. We find in that case that an employee of a furniture company delivered two gas stoves to tenants living in the second and third floors of a store building. They requested this employee to connect the stoves with the gas line. He had never been in the basement before, but in going there to find the place to shut off the gas line he struck the two matches he had with him. After the last match went out he figured he "could make it," and walked ahead in the darkness for four to seven feet, and fell into the pit in which the furnace and gas water heater were placed. This court held that "the negligence of plaintiff contributed directly thereto as the moving cause of the accident, and because thereof, plaintiff cannot recover."

A licensee is one who is on the premises of another for

his own interest or gratification. He is exercising a privilege solely for his own convenience or benefit. A licensee does not stand in any contractual relation with the owner of the premises, as a prospective purchaser does.

This matter is discussed in Restatement, Torts (Negligence), sec. 343, and is found on pages 938 to 943, from which we may briefly summarize as follows: There is only one particular in which the owner who holds his land open for business visitors is under a greater duty in respect to its physical condition than to a visit of a licensee. He has no financial interest in the entry of a gratuitous licensee, who is entitled to expect nothing more than an honest disclosure of the dangers known to the owner. On the other hand, the visit of a business visitor is, or may be, of financial benefit to the owner, and such a visitor is entitled to expect the owner will take reasonable care to discover the actual condition of the premises and either make them safe or warn him of dangerous conditions, so that he will have opportunity to decide intelligently whether or not to accept the invitation.

But the owner is subject to liability while the invitee is upon that part of the premises where the owner gives the other reason to believe that his presence is permitted or desired because of its connection with the business. In determining this area, the nature of the business to be transacted is of great importance.

The customer is a business visitor thereon, unless the owner exercises reasonable care to apprise him that the area of invitation is more narrowly restricted. If the owner should realize that either one of two doors might be taken by his business visitor to be the door to the business area, the visitor is entitled to the protection of a business visitor even though he enters the wrong door.

In our opinion, considering the fact that the defendant in its amended answer charged as follows: "And that this plaintiff was, at the time and place of the accident, a trespasser upon the premises of this defendant," and did not claim therein that plaintiff was a licensee, and as no in-

struction of any kind was offered by defendant on this or any other point, we hold that it was not error for the court to omit a definition of licensee in the fifth instruction, in which "invitee" and "trespasser" were correctly defined.

It is not disputed that certain wholesale buyers of meat from the Central Market were invited to get meat products on Sundays when needed. The invitation was general; in fact, it was nothing more than an invitation to come to the rear of the store, arouse any person or persons who might be on the inside, and obtain from them the meat products they required. The scope of the invitation must therefore be determined, not only from the conversations of the parties, but from all the facts and circumstances existing at the time the accident occurred. Clearly, under such circumstances, the scope of the business invitation extended is a question of fact to be determined by the jury after a consideration of all the evidence bearing upon the issue. Likewise, the question whether plaintiff, in going to the store in response to the invitation extended, acted within the scope of the invitation, is a question for the jury. In determining this question, the jury could well consider the fact that the invitation was not limited to any particular door or means of entrance. They should also consider whether plaintiff, in doing what he did, acted as a reasonable and prudent person would have acted under the same circumstances. They should also consider whether the Central Market, in extending the invitation as it did, was bound to anticipate that a reasonable and prudent person might not, after finding one door closed, use the other. To say that, as a matter of law, a business invitee must, under the circumstances here shown, choose at his peril one of two doors with which he is unfamiliar is not logical and reasonable. Under the record the scope of the invitation extended and the question whether plaintiff acted within such scope are clearly questions to be submitted to the jury under proper instructions. They having decided them for the plaintiff upon evidence sufficient to sustain a verdict, this court is required to give effect thereto.

Our former opinion in 142 Neb. 570, 7 N. W. (2d) 74, is hereby set aside. The judgment of the trial court is hereby affirmed.

AFFIRMED.

MESSMORE, J., dissenting.

I respectfully dissent from the majority opinion. The record discloses that the Central Market operates a retail grocery and wholesale and retail meat market in connection therewith, and is directly across from Harkert's restaurant. The wholesale meat department is located in the northwest corner of the building and is partitioned off from the retail business. The entrance to the wholesale meat department is located at the west end of the building, and the entrance to the loading dock or elevator room, the scene of the accident, is at the east end of the building. There is a room used for storage adjoining the wholesale meat department in the back of the store. No business is transacted in this room. Through this back room to the northeast corner of the building is an elevator room which is partitioned off on its east and west sides, and there is a door leading into the elevator room from the south and an iron door to the north, which leads into the alley. The west door into the wholesale meat department is about a foot from the level of the ground. The east door through which the plaintiff proceeded slides up and down and is built up from a platform.

On occasions certain customers of the Central Market were privileged to obtain merchandise on Sunday, either by calling or coming to the store. This merchandise had been furnished to Harkert's restaurant on a few occasions on a Sunday. When employees of the restaurant went to the Central Market to procure merchandise, they would go to the west door and rattle it, in an attempt to attract attention in the market. Failing on one occasion, an employee went to the front door and was admitted. There is no evidence that any Harkert employee had ever entered the east door in the elevator room on any occasion other than the morning in question.

In this connection I call attention to the testimony of the witness F. L. Hogan, who testified that his business was "Packing house and trucking," meaning he worked for Armour & Company, and in addition did some trucking with his own truck and a helper, employed by him, to pick up rubbish and trash from various places in Omaha, which he had been doing for three years or more. To the question: "And were you employed by the Central Market as an employee to do any work inside of the store or anything like that?" he answered: "No; I wasn't. Q. You were simply employed by the Central Market to come around and pick up the trash and the rubbish from the store? A. That's right. Q. And how often did you do that? A. Three times a week in the summer, and about once in the wintertime. Q. And did you do this work on Sunday? A. Sunday mornings. Q. And were you engaged in that work and doing that work on Sunday, October 27, 1940? A. Yes; I was. * * * Q. So, as I understand it, the trash is gotten together in boxes by somebody employed in the store? A. Yes. Q. And you and your helper go up the elevator and get these boxes and bring them down and load them on your truck? A. On the truck."

With reference to the alleged invitation to the plaintiff to enter the defendant's premises, the witness Hogan testified further: "A. I was standing in the alley breaking up some boxes, tying them together, cardboard boxes that I threw out of the load, as the other boy went on to take care of the rubbish. * * * Q. Now, after you had completed your work and your truck had gone, you say you had come out in the alley? A. Yes, I was in the alley at the time. Q. And what did you do so far as the door is concerned? A. Well, when I finished loading I pulled the door down to within about two or three feet, or two and a half feet of closing. * * * Q. Now, while you were out in the alley tying up these bundles of paper or cardboard for yourself, did you notice or hear anybody at the west door of the Central Market? A. Yes; the west door, I saw a young man standing there, knocking on the west door of the Central

Market. Q. And where were you with respect to this east entrance that you had come out of? A. * * * I guess, two or three feet from the east entrance. * * * Q. What, if anything, did you do or say to the boy who was by the door? A. Well, he was knocking on the door, and I told him, I says, 'You'll have to come, to this door and call the elevator man.' "

On cross-examination this witness testified: "Q. What you do is, you go down there with your truck, and then you start working on the inside of the building gathering up this stuff and hauling it out? A. No; I don't gather it up, it's already gathered up. I only go up and put the boxes on the elevator and bring it out. Q. Do they help you carry it down? A. No; I furnish my own help. Q. You carry it out by yourself? A. Yes. * * * Q. And then you saw this Harkert boy. You knew he was a Harkert boy, didn't you? A. No, I didn't. Q. Did you know who he was? A. I did not. * * * Q. And you said to him to come over to the other door and get the elevator operator? A. I told him to call the elevator operator at the east door. Q. Well —A. I told him if he wanted to get in he would have to call the elevator operator from this door. That's the way it was." It will be observed from this testimony that this witness was not an employee of the Central Market.

An employee is a person under contract of hire, express or implied, oral or written, usually applied to a trade or vocation, under the direction of the employer, with the sole right of management of the work being done for the employer by an employee. The essential elements are that the employer have control and direction, not only of the employment to which the contract relates, but to all of its details, and shall have the right to employ at will, and for proper cause discharge those who serve him. 18 R. C. L. 490, sec. 1; 30 C. J. S. 226 *et seq.*

Obviously, the Central Market did not control Hogan's work and business, or direct him. He was not an employee of the Central Market. He was not a clerk, an elevator operator, or butcher; he had his own business,—hauling

trash, with his own truck and helper, for different customers.

The testimony of Hogan, quoted above, fails, in any event, to show that he invited the plaintiff to enter the premises of the Central Market. He specifically told the plaintiff to call the elevator man from this east door. He did not tell him to go inside of the defendant's place of business. This is not an invitation, and the only way in which the plaintiff would be privileged to enter the defendant's business premises, under the circumstances, would be by the invitation, express or implied, of an employee. If the majority opinion stands, then any person not employed in or connected with the business, who happens to be near the premises doing some work, may invite a person to come into a business establishment through any entrance, to transact business, and if such person enters the premises and is injured therein the person or persons conducting the business may have to respond in damages, because, under such circumstances, the injured person was an invitee.

The majority opinion cites *Jewison v. Dieudonne,* 127 Minn. 163, 149 N. W. 20, as a case closely in point. While there is some discussion in this case involving a partnership arrangement, I desire to call attention to the following facts therein: On the day of the accident plaintiff entered the building through a rear door for the purpose of exchanging some mower repairs he had obtained on the previous day. He was injured. He was familiar with the premises and their uses, and he and others had frequently entered the building through the rear for the purpose of transacting business in the front. It is observed that in the *Jewison* case there was an open invitation for any customer to enter the rear door of defendant's premises to proceed to the front, to the office, for the purpose of purchasing merchandise. That is not the instant case.

Heavy reliance is placed in the majority opinion on the case of *Chichas v. Foley Bros. Grocery Co.,* 73 Mont. 575, 236 Pac. 361. In that case defendant company was engaged in the wholesale grocery business and had a manag-

er in charge. The plaintiff, together with his brother, had for a long time been engaged in the retail grocery business, was a steady customer of and had purchased groceries and supplies from the defendants. In his dealings with them he had been accustomed to send an employee, with a truck, to their place of business, to obtain such groceries and supplies as were needed in his retail establishment from time to time, and prior to the date of his injury plaintiff had never visited the defendants' establishment, *although he was expressly invited by the defendants' manager to call at their place of business.* The court said: "In this field of the law as to liability for negligence, the decisions are numerous, but in each case the particular fact features control as to the proper category in which it must be placed in application of well-settled principles. The general rule deducible from the authorities, * * * is clearly stated in 20 R. C. L. p. 66, as follows: 'A merchant or shopkeeper who maintains warerooms for the exhibition and sale of goods impliedly solicits patronage, and one who accepts the invitation to enter is not a trespasser nor a mere licensee, but is rightfully on the premises by invitation, and entitled to all the rights of invited persons.'" In the second paragraph of the syllabus the court held:

"The duty of a proprietor of premises to exercise reasonable care towards the safety of an invitee applies only to that portion to which the invitee would be likely to go, and in the case of a business invitee only to such parts of the building as are used for the actual conduct of the business, and the use of the premises by the invitee must be to advantage of the inviter or to the mutual advantage of both parties."

It will be noted that in the foregoing case the plaintiff had an express invitation by the manager of defendants' wholesale grocery company to visit the premises. That is not the instant case. The following cases are cited in the majority opinion as supporting plaintiff's case, which we briefly discuss.

In *St. Louis, I. M. & S. Ry. Co. v. Wirbel,* 104 Ark. 236,

149 S. W. 92, Harry Wirbel, a minor, by his mother as next friend, brought an action for personal injuries, alleged to have been received on account of the negligence of the defendant by reason of the collapse of a coal hoisting machine on premises in its yards. Wirbel was a locomotive engineer. He went to the yards of the railroad company at McGehee, Arkansas, to procure employment. He was not acquainted with any person in McGehee, and the morning after his arrival he accosted a negro near the station and asked directions to the master mechanic's office. He went to the office and inquired of the office man for the master mechanic, without disclosing his purpose for desiring to see him. He was informed that the master mechanic was not in, but was somewhere in the yards; that "he could probably find him there." This statement was made by an employee of the railroad company who was in the office. In his search for the master mechanic Wirbel came to a coal chute, not knowing what it was, looked in the door, spoke to the operator of the hoisting machine, another employee of the company, and was just on the point of asking for the master mechanic when the machinery broke, fell on him and injured him. It was stated in the opinion: "If the master mechanic had authority to employ locomotive firemen and was accustomed to do so at his office or anywhere in the yards where he might be found, and his office man directed appellee to see him in the yards, in so doing he still had the right to rely upon the invitation and the duty of appellant to exercise ordinary care to protect him from injury." The above case presents a factual situation distinct from the instant case.

In *Pauckner v. Wakem*, 231 Ill. 276, 83 N. E. 202, the appellants had the goods of the Chicago Tribune Company stored in a warehouse. As disclosed by the opinion: "It must have been within the contemplation of the appellants when these goods were received into their warehouse, that sooner or later a delivery of them would have to be made to the owner of the goods. The delivery of the goods by appellants and the receipt thereof by the Chicago Tribune

Company was a matter of business which was of mutual interest to the parties. The duty of appellants to the servant of their customer was the same as to the customer himself. When appellee and Carpenter went to appellants' warehouse for the purpose of removing the goods of the Chicago Tribune Company, the appellants owed these servants the same duty that would have been due to the president or general manager of the Chicago Tribune Company had he called in person for the goods." The evidence showed that the goods were stored on the east side of the passway, down to and beyond the elevator shaft, into which appellee fell. The court said: "The invitation to go there for the goods must be held broad enough to include all the space occupied by the goods, together with necessary passways in and out of the warehouse. The unguarded elevator shaft into which appellee fell was located immediately in the open space or passway through which one would necessarily have to pass in order to get to the goods stored immediately east and south of the elevator."

That part of the premises entered by the plaintiff in the instant case was a separate and distinct room, where there was no merchandise which he could obtain and purchase. Not one of the employees of Harkert's restaurant had ever purchased merchandise from the Central Market by going first through the room which plaintiff entered on the morning in question. The cited case is not in point.

In the case of *Rudolph v. Elder*, 105 Colo. 105, 95 Pac. (2d) 827, the plaintiff was a guest at defendant's hotel. She sustained an injury as the result of falling into a freight elevator shaft, adjacent to the rear entryway of the hotel. This entryway was about 15 feet long and six feet wide and led directly from the alley to the freight elevator. At the alley end was a door which at the time of the accident was open, and at the inner end was another door leading to the elevator shaft. Toward the rear of the passage, and to the left as one entered, was a door permitting access into the main lobby through what was known as the "Dutch Grill" room. Plaintiff testified that shortly after her ar-

rival at the hotel one of the bellboys, an employee, while he was removing baggage from the automobile in which she had arrived, advised her to store her car in a near-by independently-operated garage, saying: "Leave your car in the garage and come in the back entrance which is across the alley from the garage. There is a door there leading into the Dutch Grill of the hotel. Walk across the alley, go into the door, and you will find it will take you right into the lobby." Here is an express invitation and direction given the plaintiff by an employee. The premises had been entered in this manner many times; it was customary to so enter the lobby. That is not true in the instant case.

In *Palmer v. Boston Penny Savings Bank,* 301 Mass. 540, 17 N. E. (2d) 899, the court said: "The plaintiff had the right to enter the garage in order to obtain his automobile, and the defendant, whose liability depended not only upon the scope of the invitation extended to the plaintiff but also upon the terms of the bailment in accordance with which it had accepted the custody of the plaintiff's property, was required to permit him to enter by the usual means furnished by the defendant and under such conditions as the defendant should properly prescribe for his reasonable safety and convenience." The foregoing statement is self-explanatory.

In the case of *Armour & Co. v. Rose,* 183 Ark. 413, 36 S. W. (2d) 70, an employee of Armour's for eight years or more had sold merchandise on Sunday to Rose, one of his customers. It was against the rules of the company for him to sell to the appellee in the way that he did. On the occasion in question, the employee Fine opened a door on the company's premises and Rose stepped out of Fine's way, walked three or four feet and fell into an open elevator shaft. Fine had gone purposely to the manager's office to procure the key, and went out with Rose, and Rose followed him. While the evidence was in dispute as to whether or not the company knew that their employee salesman was transacting business with Rose, the fact remained that Fine, the employee, escorted Rose through the building,

leading the way. Such a situation is not analogous to the instant case.

In *Brett v. Century Petroleums, Inc.*, 302 Ill. App. 99, 23 N. E. (2d) 359, the court held: "Where plaintiff's automobile was being repaired at filling station, she went into the ladies' room, when she came out she entered a door leading to the greasing pits and fell into a pit, plaintiff was not an invitee to the room where the grease pits were and had no right, as an invitee, to traverse that room in its unlighted condition." It was said in the opinion: "After giving to plaintiff the full benefit of her evidence and the law applicable thereto, we are forced to the conclusion that her injury resulted from her gross carelessness at the time of the accident and immediately prior thereto." The judgment was reversed.

It is noted that the foregoing cases cited in the majority opinion do not support the conclusion reached therein. My research fails to find a case that goes to the extreme limit to permit recovery as in the instant case, and I therefore cannot agree with the majority opinion.

The motion made by the defendant for a directed verdict should have been sustained.

SIMMONS, C. J., and YEAGER, J., concur in the dissent.